UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____X

MARCO LAVAYEN,

                    Petitioner,                          **REPORT AND RECOMMENDATION**
                                                         02-CV-0305 (NG) (LB)

         -against-

GEORGE DUNCAN,
Great Meadow Correctional Facility,

                    Respondent.
_____X

**BLOOM, United States Magistrate Judge:**

The Honorable Nina Gershon, United States District Judge, referred this petition seeking

a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to the undersigned for a Report and

Recommendation in accordance with 28 U.S.C. § 636(b). For the following reasons, it is

recommended that the petition should be denied.


## BACKGROUND

I.   **Facts**

According to the testimony adduced at trial, in the early morning hours of March 26,

1989, petitioner fired numerous shots into a crowded social club killing Reinaldo McCarthy.

The shooting occurred at the Body and Soul social club, located at 604 Rogers Avenue in the

Flatbush section of Brooklyn, New York, during a party organized by Merrick Morgan

("Morgan"), who had previously organized events at the club. Tr. 76.[1] The club's layout

consisted of a vestibule by the front door where patrons would pay for entry, a raised stage at

_____

[1]"T. __" refers to pages of the trial transcript.

one end of the club, and a main dance floor with an elevated tower where DJs worked and could observe the activity on the floor below. Tr. 30, 56-58, 82.

Approximately one week before the shooting, on March 18, 1998, Morgan saw petitioner "doing something that [he] didn't like" in front of the club with about three other individuals and requested that petitioner leave the area. Tr. 79. Petitioner gave Morgan "a dirty look," and Morgan went into the club. Id. Morgan had no further interaction with petitioner until the night of the shooting. Tr. 125.

On the night of March 25, 1989, approximately 150 to 200 people came to the Body and Soul club for the party Morgan was hosting. Tr. 58, 63, 113. Morgan was working the party along with his sister Audrey Morgan Alexis ("Alexis"), who was tending bar. Tr. 50. The party continued into the early morning of the 26th, and at around 3 a.m., Morgan, who was on the DJ tower, noticed petitioner enter the club. Tr. 80. Morgan immediately confronted petitioner, telling him that he "didn't appreciate what he did the week before." Id. Petitioner gave Morgan a "dirty look," and Morgan went back up to the tower. Id. Morgan kept his eye on petitioner from the tower and noticed him speaking with someone who looked up at Morgan while speaking with petitioner. Id. Another person came to speak to petitioner and he also looked towards Morgan while petitioner was speaking to him. Tr. 81, 131-132. Morgan observed petitioner for about an hour, then went downstairs to dance. Tr. 85-86, 126. While dancing, Morgan noticed people moving away from a section of the dance floor in front of the tower. Tr. 86-87, 137. As Morgan approached the area to see what was happening, he heard approximately five shots. Tr. 87-88. Morgan saw a man, approximately three feet away from him, facing the stage and backing up towards the front door firing shots. Tr. 88, 91. Morgan saw the shooter's

2

face and recognized petitioner. Tr. 94. Morgan observed petitioner fall down while backing

towards the club's front door, and as petitioner was falling onto his back, Morgan saw "fires"

emanating from petitioner's hands, but he did not actually see guns in petitioner's hands. Tr. 94-

96. As the shots were fired, Morgan saw Reinaldo McCarthy go down on the stage area. Tr. 98-

99. Morgan did not notice petitioner leave through the front door after he had fallen on people

near the entrance. Tr. 100. A moment later, Morgan heard gunfire coming from beyond the

front door. Id. Morgan managed to turn on the lights and went over to the stage where

McCarthy was bleeding from the forehead. Tr. 100-101. Morgan then went outside and pressed

the "emergency switch" to call the police. Tr. 101. At trial, Morgan stated that he did not see

anyone besides petitioner with a weapon at the club that night. Id.

At approximately 4:10 a.m., Alexis heard shots coming from the area near the elevated

tower. Tr. 50-52. After a burst of several shots in the area near the tower, Alexis noticed a

pause in shooting and then heard more shots being fired from the front door area. Tr. 54, 70.

Alexis testified that the lighting in the club was dim and that somebody held her down when the

shots were fired. Tr. 60. Alexis saw people running from where the shots were fired near the

front door towards the rear emergency exit. Tr. 61.

Officers William Regina and John Cisek of the 71st Precinct arrived on the scene

sometime after 4 a.m. and secured the crime scene. Tr. 28-29, 37-39. No gun was found on the

victim lying on the stage or near his body. Tr. 47. Regina noticed empty shell cases near the

front door of the club. Tr. 29, 45. A bullet hole was found on the wall behind the stage. Tr. 35.

Morgan told the police that the shooter was light-skinned, about five feet eight inches tall, and

weighed about 140 to 150 pounds. Tr. 102. Morgan told them that "Panama," the name that

3

Morgan had heard someone use to address petitioner the week before, was the shooter. Tr. 102, 116.

Detective William Romano of the Crime Scene Unit arrived and noticed "numerous ballistics evidence at the location." Tr. 166. Romano recovered a .38-caliber lead bullet on the stage by the head of the deceased and a 9mm lead bullet from the wall above the deceased. Tr. 171-72. Romano also identified .25-caliber and 9mm bullets on the floor near the deceased. Tr. 172-73. Romano recovered 9mm and .25-caliber discharged shell casings on the floor in the area near the club's entrance. 173-76. Romano also discovered an undischarged .380-caliber cartridge from the floor of the club. Tr. 176. Romano recovered ballistics evidence outside of the club, and, in total, recovered 49 pieces of ballistics evidence from both inside and outside the club, the bulk being .25-caliber and 9mm bullets. Tr. 182-83. Detective Michael Albanese, a microscopist for the ballistics squad, testified at trial that the recovered .38-caliber bullets could have been fired from a 9mm gun. Tr. 212. Dr. Marie Macajoux, of the Office of the Chief Medical Examiner of New York, performed an autopsy on McCarthy on March 27, 1989; McCarthy had one gunshot wound in his left leg and another on his head. Tr. 197. McCarthy died from the gunshot wound on his head. Tr. 199.

On March 31, 1989, Morgan identified petitioner as the shooter in a police lineup at the 71st Precinct. Tr. 104. Petitioner was charged with murder in the second degree, two counts of criminal possession of a weapon in the second degree, and two counts of criminal possession of a weapon in the third degree. A Wade hearing[2] was held in Supreme Court, Kings County, on

---

[2]A Wade hearing is held to determine whether a pretrial identification procedure was unduly suggestive. United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967).

June 15, 1990 before Justice Michael R. Juviler, who denied petitioner's motion to suppress. W. 61.[3] Petitioner's trial commenced on October 23, 1990 before Justice Albert Tomei. On October 30, 1990, petitioner was convicted of depraved indifference murder in the second degree for killing Reinaldo McCarthy. Tr. 370. At sentencing, petitioner's counsel moved to set aside the verdict; the motion was denied, S. 2-4.[4] The court sentenced petitioner to a term of 20 years to life on November 28, 1990. S. 12.

## II.    Procedural History

On July 26, 1993, the Appellate Division affirmed petitioner's judgment of conviction. People v. Lavayen, 195 A.D.2d 609 (2d Dep't 1993). On August 30, 1993, the Court of Appeals denied petitioner's application for leave to appeal. People v. Lavayen, 82 N.Y.2d 721 (1993). Petitioner did not seek a writ of certiorari. Petitioner filed a motion to vacate the judgment pursuant to N.Y. Crim. Proc. Law § 440.10 ("Section 440.10") on July 6, 2000. Petitioner's motion raised ineffective assistance of counsel based, among other things, on counsel's failure to adequately investigate the case and present witnesses whose statements would have established that: (1) the shooting at the club that night was over a gold bracelet, which Vincent Chin had stolen from Charles Radcliff, a.k.a. "Killer" ("Radcliff" or "Killer"); (2) Radcliff had walked through the club with a gun, shining a flashlight on witnesses faces, in an attempt to find Chin; (3) Radcliff was a member of the same "crew" as Morgan; (4) all the lights went out just before the shooting started; and (5) Radcliff was observed shooting in the direction of the victim McCarthy. Petitioner's Motion to Vacate, dated July 6, 2000, at 18.

---

[3]"W. ___" refers to pages of the Wade hearing transcript dated June 15, 1990.

[4]"S. ___" refers to pages of the sentencing transcript dated November 28, 1990.

5

The Honorable Albert Tomei assigned petitioner counsel and in February and March 2001, the court conducted a four-day evidentiary hearing on petitioner's motion to vacate. Petitioner received the Rosario packet at that time which included more than 50 DD-5 police reports summarizing witness interviews, including witnesses who "exonerated Lavayen," "implicated Killer," "attested to Killer's motive," "gave a description of the shooter which did not match [petitioner]," and "belied testimony recounted by Merrick Morgan." Petitioner's Supplemental Background ("Pet. Suppl."), filed with his habeas petition, at 2. Thus, petitioner argued that his trial counsel was ineffective because he failed to investigate and present the "statements of witnesses ... who exonerated Lavayen and implicated 'Killer'" and ballistics evidence that refuted the prosecution witness's account "that only two guns, both wielded by Lavayen, were fired inside the club." Pet. Suppl. at iii.

At the hearing on the motion to vacate the conviction, petitioner's counsel presented the testimony of six witnesses as well as calling upon petitioner's trial counsel, Leo Kimmel. Hulen Ginn, who was 18 at the time of the shooting testified that he went to the club with friends at around 2:30 a.m. on March 26, 1989. H. 9, 40.[5] While there, Ginn was told by another acquaintance that Radcliff was at the club walking around with a flashlight and looking for the person who stole his bracelet. H. 10. According to Ginn, Radcliff was a member of the "Parkside Group," a group in which Morgan was also a member. H. 32. Ginn testified that he saw Radcliff with two of his friends at the club and observed one of the friends hand a gun to Radcliff. H. 11. Ginn testified that he later observed Radcliff point his flashlight with his left hand toward the stage and then raise his right hand when he heard shots ring out. H. 19, 23.

---

[5]"H. __" refers to pages of the Section 440.10 motion hearing transcript.

Ginn claimed that he saw red flashes come from Radcliff's right hand and from the stage. H. 23. Ginn saw Chin on the stage and McCarthy positioned between Chin and Radcliff. H. 30. While Ginn rushed towards the front door when the shots were fired, he saw petitioner in front of him also running towards the front door. H. 19-20. Ginn was shot in his right calf, but managed to run out of the club and towards his home. H. 20. Ginn testified that he went to the 71st Precinct and spoke with an officer three or four days after the shooting when he heard that petitioner had been arrested. H. 35-36. Ginn informed the officer that petitioner was not involved in the shooting and described what he observed Radcliff do that night. H. 36. About three or four days after that, Ginn went back to the precinct and spoke with a detective and an individual from the D.A.'s office. H. 37-38. The D.A.'s office subsequently administered a polygraph test on Ginn, asking him whether petitioner fired shots that night, to which Ginn answered in the negative. H. 39. Someone at the homicide division of the D.A.'s office told Ginn that based on the results of the test, it appeared that he was telling the truth. H. 40.

Ginn also recounted how he was interviewed by petitioner's initial trial counsel James Payne. H. 45. Ginn said that he was willing to testify at trial, but after speaking with Payne about two more times on the phone, Payne never contacted him again. H. 47. Four months after petitioner's arrest, Ginn was arrested on drugs, weapon and assault charges. H. 49-50. Ginn encountered petitioner in 1991 at Coxsackie Correctional Facility, and petitioner told him that he was serving time for the murder of McCarthy. H. 52-53. Ginn did not intervene on petitioner's behalf until May of 2000, when he provided an affidavit in support of petitioner's Section 440.10 motion. H. 53.

Petitioner's counsel called Tony Francis, who was 17 at the time of the shooting. H. 116.

Francis testified that he, petitioner, and McCarthy were friends and that the three of them had no connection to or conflict with the Parkside Group. H. 107–10. Francis stated that he was at the club on the night of the shooting and saw Radcliff walking around the club with a flashlight in his hand. H. 130-31. Francis noticed Radcliff in an argument with someone on the dance floor and then he saw people backing away from Radcliff. H. 135. Francis heard shots ring out from the area where the argument was occurring. H. 136. Francis could not see who was shooting, but he ran towards the front door and saw petitioner standing by the entrance. H. 138. Francis then ran towards his home. H. 139.

Petitioner's counsel also introduced the testimony of Tony Francis's brother, Cleon, and Luis Hinds, both of whom were friends of petitioner who were in the club the night of the shooting. The two witnesses corroborated Tony Francis's testimony. See H. 194-99, 248-52. Both also stated that they would have been willing to testify at petitioner's trial on his behalf, but that they did not go to the police with their information due to their mistrust of the police and fear of retribution from the Parkside Group. See H. 253-54, 200, 217-18. Nathaniel Milan also testified that he was at the club on the night of the shooting and saw Radcliff holding a gun in his hand at the club. H. 287.

For a final witness, petitioner's counsel called Maurice Thompson, who was incarcerated for manslaughter at the time of the hearing. H. 322. Thompson was the only witness who did not know petitioner at the time of the shooting. H. 325. Thompson related how Chin came to possess a gold bracelet belonging to Radcliff and how he would wear the bracelet to deliberately provoke Radcliff into a confrontation. H. 332-35. Thompson testified that he, Chin, and two other acquaintances—Andrew and Blocker—decided to do a "shoot up" at the Body and Soul

8

club on the night of the 25th with Radcliff and the Parkside Group as the intended victims. H. 338-40. Thompson testified that he brought a .38-caliber gun with him into the club on the night in question, but gave it to Andrew once inside. H. 337, 345-346. Thompson went outside to call Chin and told him to bring some guns to the club as members of the Parkside Group had guns H. 347-50. In short, Thompson testified that what transpired that night at the Body and Soul club was a shootout between Radcliff and the Parkside Group and Chin and his friends. H. 354-64. Thompson also testified that he got shot that night in both of his thighs. H. 359.

Finally, petitioner's trial counsel, Leo Kimmel ("counsel"), took the stand. Counsel did not recognize petitioner as a former client at the hearing. H. 398. Counsel testified that he had been practicing for 35 years and had tried hundreds of criminal cases. H. 400. Counsel stated that he did not have any independent recollection of the specifics of petitioner's case and that he no longer had the case file in his possession. H. 402, 410. Counsel testified that he was "sure" he "had an investigator on this case," and that if there were statements in the Rosario material that implicated another shooter, "the investigator would have followed it up." H. 408. Counsel could not recall interviewing any witnesses himself, id., but testified that if he learned that a witness exculpated his client and passed a lie detector test, he would have interviewed that witness. H. 408, 417. Overall, counsel could not recall very much about this case.

Justice Tomei denied petitioner's Section 440.10 motion on May 4, 2001. In his decision, he noted "[n]otwithstanding the lapse of more than a decade since the conviction in this case, the court has afforded defendant a hearing on his claim." Decision and Order dated May 4, 2001 at 14 ("440 decision"). Justice Tomei described how Leo Kimmel became petitioner's trial counsel after two previous court-appointed attorneys and one assigned defense investigator

were relieved of their duties. <u>People v. Lavayen</u>, No. 4589/89, slip op. at 3 (N.Y. Sup. Ct. May 4, 2001). Justice Tomei noted that the trial court appointed counsel to represent petitioner on May 18, 1990 and appointed a duly licensed investigator to work on petitioner's behalf on May 24, 1990. <u>Id.</u> Justice Tomei held that counsel ably represented petitioner at trial and presented a reasonable defense strategy, casting Morgan's testimony in an unreliable light and emphasizing to the jury that a number of guns were fired on the night of the shooting, thus making it impossible to say with certainty that petitioner was responsible for McCarthy's death. <u>Id.</u> at 6-7, 19-20. Justice Tomei further held that "[i]t simply does not follow that because Mr. Kimmel ... could not recall what investigation was undertaken over a decade ago or whether he considered calling at trial the witnesses who testified at the post conviction hearing, he and defendant's two other attorneys must have been derelict in their duty to their client." <u>Id.</u> at 16. Petitioner filed leave to appeal the denial of his Section 440.10 motion on August 14, 2001; petitioner's leave application was denied by the Appellate Division, Second Department on November 14, 2001.

## III.   The Instant Petition

Petitioner filed the instant petition for a writ of habeas corpus on January 14, 2002, raising: (1) insufficiency of the evidence; (2) prosecutorial misconduct; and (3) ineffective assistance of counsel. Respondent moved to dismiss the petition as time-barred. By order dated October 6, 2004, the Honorable Nina Gershon adopted my Report and Recommendation and denied respondent's motion. I appointed habeas counsel for petitioner, and on October 29, 2004, Professor Ursula Bentele of Brooklyn Law School's Legal Services Corp. entered a Notice of

Appearance on petitioner's behalf.[6]  On December 23, 2004, respondent filed an opposition to

the instant petition, see Respondent's Memorandum of Law in Opposition to Petition for a Writ

of Habeas Corpus ("Resp. Opp."), and submitted a Supplemental Memorandum of Law

challenging petitioner's claim of ineffective assistance of counsel.  Petitioner filed a reply to

respondent's Supplemental Memorandum of Law on June 15, 2005.  See Petitioner's

Memorandum of Law in Reply to Respondent's Supplemental Memorandum of Law.  Petitioner

filed a Supplemental Memorandum of Law in Support of Habeas Corpus Petition on September

29, 2005, and respondent filed a Second Supplemental Memorandum of Law on November 30,

2005.

## DISCUSSION

### I.    Standard of Review

Petitioner's claims are governed by the standards set forth in the Antiterrorism and

Effective Death Penalty Act ("AEDPA").  28 U.S.C. § 2254.  For claims that have been

adjudicated on the merits in state court proceedings, a petitioner must show that the state court

proceedings:

> (1) Resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) Resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254 (d).

---

[6]  The Court commends Professor Bentele and the students who worked on this case
under her supervision.  They did an outstanding job on petitioner's behalf and their work product
was exemplary.

In <u>Williams v. Taylor</u>, the Supreme Court held that a state court decision is "contrary to" clearly established federal law if a state court (1) "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court. 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 38 (2000). "'Clearly established Federal law' in §2254(d)(1) 'refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state court decision." <u>Id.</u>, at 412, (cited in <u>Carey v. Musladin</u>, 127 S. Ct. 649, 653, 166 L. Ed. 2d 482 (2006)). As to the "unreasonable application" clause of the AEDPA, habeas relief is warranted only "if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id</u>. at 407.

The Supreme Court has ruled that the reasonableness of the application of the law is to be assessed objectively rather than subjectively. <u>Id</u>. at 409-10. In addition, the Court cautioned that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." <u>Id</u>. at 410 (emphasis in original). Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>accord Bell v. Cone</u>, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). The Second Circuit has explained that while "[s]ome increment of incorrectness beyond error is required ... the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" <u>Francis v. Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000)(quotation omitted).

## II. Petitioner's Claims

### A. Insufficiency of the Evidence

Petitioner claims:

> The evidence presented to prove petitioner's guilt was entirely circumstantial and
> f[ai]led to eliminate the reasonable hypothesis that McCarthy was k[i]lled by
> someone other than petitioner. The combination of ballistics evidence, the expert
> testimony, and the observations of the sole "eyewitness" who testified—out of
> 150 to 200 patrons estimated to be inside of the club on the night of the
> incident—was insufficient to prove that petitioner fired the fatal shot.

Supplement - B-1, attached to Pet. Respondent argues that petitioner does not meet the standard

to grant habeas relief on this claim and asserts that petitioner's guilt of depraved indifference

murder was proven beyond a reasonable doubt. Resp. Opp. at 47. The Court agrees that

petitioner's insufficiency of the evidence claim should be denied.

The Fourteenth Amendment's Due Process clause "prohibits conviction 'except upon

proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the

defendant] is charged.'" Einaugler v. Supreme Court of the State of New York, 109 F.3d 836,

839 (2d Cir. 1997) (quoting In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368

(1970)). A petitioner challenging the sufficiency of the evidence of his guilt in a habeas corpus

proceeding "bears a very heavy burden." Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811

(2d Cir. 2000). Habeas corpus relief must be denied if, "after viewing the evidence in the light

most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.

Ct. 2781, 61 L. Ed. 2d 560 (1979) (emphasis in original) (citation omitted); Farrington v.

Senkowski, 214 F.3d 237, 240 (2d Cir. 2000). Furthermore, in making its assessment, a federal

habeas court must "credit every inference that could have been drawn in the state's favor ...

13

whether the evidence being reviewed is direct or circumstantial." Reddy v. Coombe, 846 F.2d 866, 869 (2d Cir. 1988).

The Jackson "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n. 16; see also Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999) ("[a] federal court must look to state law to determine the elements of the crime"). Under New York law, a defendant is guilty of murder in the second degree when either "with intent to cause the death of another person, he causes the death of such person or of a third person;" or "under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." N.Y. Penal § 125.25 (McKinney).

The depraved indifference murder statute has come under intense scrutiny by the New York Court of Appeals. See generally, People v. Feingold, 7 N.Y.3d 288, 292 (2006) ("[B]eginning in 2003, a number of decisions by this Court have pointed the law in a different direction.")

As the Honorable Nina Gershon recently held in Flowers v. Fisher:

> The evolution of the construction of the depraved indifference murder statute by the New York Court of Appeals has created some confusion for federal courts conducting collateral review of depraved indifference murder convictions. In particular, questions persist about whether the State Court has created new law, or merely clarified law that was already in existence, and about the extent to which the holdings of recent cases are applicable retroactively. See, e.g., Policano v. Herbert, 453 F.3d 75, 76 (2d Cir. 2006) (certifying questions to the New York Court of Appeals concerning the elements of depraved indifference murder at the time of the petitioner's conviction); see also the concurring and dissenting opinions in Policano v. Herbert, 453 F.3d 79 (2d Cir. 2006) (denying *sua sponte* motion for rehearing *en banc* of the petition for a writ of habeas corpus).

No. 03-CV-5405 (NG)(VVP), 2006 WL 3050876, *12 (E.D.N.Y. Oct. 23, 2006).

At the time of petitioner's conviction for depraved indifference murder on October 30, 1990, under New York law, a jury was permitted to find that the elements of depraved indifference murder were satisfied beyond a reasonable doubt under the facts of the instant case. Although later case law requires a showing of reckless conduct, evincing a depraved indifference to human life, rather than an intent to kill, that law will not be applied retroactively. See Policano v. Herbert, 7 N.Y.3d 588, 603-04 (2006).

Here, petitioner's challenge to the sufficiency of the evidence is unavailing. Viewing the evidence in the light most favorable to the prosecution, and drawing all permissible inferences in the prosecution's favor, a rational juror could have found petitioner guilty of the crime for which he was charged. As noted by the Appellate Division:

> Viewing the circumstantial evidence in the light most favorable to the prosecution, and giving it the benefit of every reasonable inference to be drawn therefrom, we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. The facts from which the inference of guilt is drawn, when perceived as a whole, are inconsistent with the defendant's innocence and exclude to a moral certainty every reasonable hypothesis other than guilt ... . Moreover, upon exercise of our factual review power, we are satisfied that the verdict was not against the weight of the evidence ... .

Lavayen, 195 A.D.2d at 609 (citations omitted). Notwithstanding petitioner's arguments to the contrary, this Court must defer to the findings of the jury, who credited Morgans's testimony and found that petitioner fired a bullet that killed McCarthy. See Jackson, 443 U.S. at 319; Mallette v. Scully, 752 F.2d 26, 31 (2d Cir. 1984). See also United States v. Brown, 776 F.2d 397, 403 (2d Cir. 1985), cert. denied, 475 U.S. 1141, 106 S. Ct. 1793, 90 L. Ed. 2d 339 (1986) (As long as the jury resolves issues in a reasonable fashion, the evidence must be found sufficient; the fact

that some inferences drawn from circumstantial evidence were not inevitable does not mean that the evidence was insufficient to prove a defendant's guilt beyond a reasonable doubt.). Moreover, the evidence establishing that petitioner fired guns in a crowded club would support his conviction based on the current "depraved indifference murder jurisprudence involv[ing] depravity as a distinct mens rea." Policano v. Herbert, 7 N.Y.3d at 606.

In addition, petitioner's claim that the verdict was against the weight of the evidence does not present a federal question and therefore cannot afford petitioner habeas corpus relief. See Tankleff v. Senkowski, 135 F.3d 235, 246 (2d Cir. 1998) ("*we can only grant habeas relief based on violations of federal rights*") (emphasis in original). Petitioner's "'weight of the evidence' argument is a pure state law claim." Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001).

Accordingly, as the evidence adduced at trial was constitutionally sufficient to prove petitioner was guilty of second degree murder based on depraved indifference to human life, it is recommended that petitioner's insufficiency of the evidence claim should be denied.

## B. Prosecutorial Misconduct

Petitioner alleges that "the prosecutor not only mischarac[e]rized and distorted the extensive ballistics evidence that was actually introduced at trial, but also created spurious, prejudicial facts that appear nowhere in the record." Supplement - B-2, attached to Pet. Petitioner claims that he was denied a fair trial by the prosecutor's misconduct.

The Appellate Division held that petitioner's arguments regarding the alleged prosecutorial misconduct were unpreserved for appellate review, and, in any event, "the comments in question constituted reasonable conclusions fairly drawn from the testimony and

ballistics evidence adduced at trial." Lavayen, 195 A.D.2d at 609 (citations omitted). The Appellate Division cited New York C.P.L. § 470.05[2], which preserves for appellate review only those questions of law as to which "a protest ... was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." See also People v. Wilt, 794 N.Y.S.2d 724, 726 (2005) (concluding that under New York C.P.L. § 470.05[2], claim of prosecutorial misconduct during summation was unpreserved for review, as no objection was raised at trial).

It is well established that New York C.P.L. § 470.05[2] is an adequate and independent state procedural rule. Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999); Peterson v. Scully, 896 F.2d 661, 663 (2d Cir. 1990). The Second Circuit has held that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 2000). Accord Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989); Fama, 235 F.3d at 810 n.4 ("where a state court says that a claim is 'not preserved for appellate review' and then rules 'in any event' on the merits, such a claim is not preserved."); Garcia, 188 F.3d at 77-82; Glenn v. Bartlett, 98 F.3d 721, 724-25 (2d Cir. 1996). The court's statement that the claim was "unpreserved" decided the claim on an adequate and independent state ground. The appellate court's alternative holding, which rejected the prosecutorial misconduct claim on the merits, does not avoid the application of the procedural bar doctrine. See Harris, 489 U.S. at 264 n.10 ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" as long as it "explicitly invokes a state procedural bar rule as a separate basis for decision")

(emphasis in original); see Glenn, 98 F.3d at 724 (state decision which denied claim as not preserved for appellate review represented an independent and adequate state procedural ground even though court addressed merits of claim "in the interests of justice"). Accordingly, petitioner's claim of prosecutorial misconduct is procedurally barred from habeas review.

A petitioner may overcome a procedural bar by (1) a showing of both good cause for the procedural default and prejudice therefrom, or (2) demonstrating that the failure to consider the federal claim will result in a fundamental miscarriage of justice, specifically the conviction of an actually innocent person. See Bousley v. United States, 523 U.S. 614, 622, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998); Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991). Petitioner does not demonstrate cause and prejudice, nor does he demonstrate that he is actually innocent. Therefore, the Court should not review this claim on the merits.

However, even if the claim were not barred and the Court were to reach the merits, the claim would still be denied. A federal court may only grant habeas relief if the prosecutor's comments "constituted more than mere trial error, and were instead so egregious as to violate the defendant's due process rights." Tankleff, 135 F.3d at 252. Petitioner must show "that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." Bentley v. Scully, 41 F.3d 818, 823 (2d Cir. 1994). In considering whether petitioner suffered actual prejudice, the court should evaluate (1) the severity of the misconduct, (2) any measures adopted to cure the misconduct, and (3) the certainty of the conviction absent the improper statements. Floyd v. Meachum, 907 F. 2d 347, 353 (2d Cir. 1990).

Summation comments warrant reversing or disturbing a conviction only if they unfairly

prejudiced defendant. United States v. Young, 470 U.S. 1, 12-13, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985). Thus, in weighing the severity of the misconduct, the Court must examine whether the prosecution's remarks were responsive in tenor and scope to defense counsel's summation remarks. Id. The prosecutor's allegedly improper and inflammatory statements here were responsive to defense counsel's arguments that the bullet that killed McCarthy could have come from a gun other than petitioner's two guns. Detective Albanese testified at trial that the .38-caliber shell found near the deceased's head could have been shot from a 9mm gun. Tr. 212. Therefore, the prosecutor's argument on summation, that only two guns, a 9mm and a .25 caliber, were responsible for McCarthy's death, Tr. 291, is not prosecutorial misconduct. Based on the trial record, the prosecutor's statements were "unlikely to have affected the jury's ability to judge fairly." Darden v. Wainwright, 477 U.S. 168, 181-182, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (prosecutor's summation did not render trial fundamentally unfair where prosecutor did not manipulate or misstate the evidence, and comments were in part invited by or responsive to the summation of the defense).

Moreover, the trial court's curative measures mitigated any potential harm to petitioner's case. The court instructed the jury that it may consider counsel's arguments, but that they may disregard them as well and that ultimately it was their memory of the evidence that controls. Tr. 256, 311-12. Viewed in the context of the entire case against petitioner, the prosecutor's remarks on summation, which responded to defense counsel's remarks, did not render petitioner's trial "fundamentally unfair." Donnelly v. DeChristoforo, 416 U.S. 637, 645, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). Therefore, petitioner's prosecutorial misconduct claim should be denied.

## C. **Ineffective Assistance of Counsel**

Petitioner alleges that his trial counsel failed to provide effective assistance when he failed to: (1) fulfill his duty to become familiar with the facts of petitioner's case (2) undermine the prosecution's case; and (3) investigate and consider possible alternative defenses that might have been more effective. See Pet. Memo of Law at 28-39 (Document 24). Petitioner therefore argues that the state court decision violated clearly established Supreme Court law. Id. at ii. The Court does not agree and recommends that petitioner's ineffective assistance of counsel claim should be denied for the following reasons.

### 1. The Strickland Standard

In order to establish ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

Strickland v. Washington, 466 U.S. 688, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Thus to make out an ineffective assistance claim, the petitioner must demonstrate both (1) that his attorney's performance "fell below an objective standard of reasonableness," id. at 688, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In assessing whether counsel's performance was reasonable, judicial scrutiny "must be highly deferential," and the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that,

under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689 (quotation marks omitted); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998).

In assessing counsel's performance, the Court "must conduct an objective review ... measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" Wiggins v. Smith, 539 U.S. 510, 523, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (quoting Strickland, 466 U.S. at 688-89)). The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct" and has instead emphasized that "'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Id. at 521 (quoting Strickland, 466 U.S. at 688).

With regard to assessing a counsel's decision to forego a trial strategy, the Court "must apply a 'heavy measure of deference to counsel's judgments,'" Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 691), and "will not normally fault counsel ... if [that trial strategy] also entails a significant potential downside." Id. (citations omitted). "Thus, [a] lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision ... and strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. (citations omitted; alteration in original). Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91.

To establish the requisite effect of counsel's performance on the outcome of the proceedings, it is not sufficient for the habeas petitioner to merely show that counsel's errors had "some conceivable effect" on the outcome. Strickland, 466 U.S. at 693. Rather, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id. This determination, unlike the determination whether counsel's performance fell below an objective standard of reasonableness, may be made with the benefit of hindsight. See Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993) ("We adopted the rule of contemporary assessment of counsel's conduct because a more rigid requirement 'could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.'") (quoting Strickland, 466 U.S. at 690).

### 2.    Failure to Undermine the Prosecution's Case

Petitioner fails to establish that his counsel's representation was deficient based on his failure to challenge the ballistics evidence and his failure to impeach Morgan's testimony. The record clearly reflects that counsel aimed to cast doubt on the prosecution's theory that McCarthy was shot by bullets from two guns fired by the petitioner. Counsel's cross-examination of Morgan elicited testimony that the club's metal detector was not working on the night of the murder, thus undercutting Morgan's testimony that petitioner was the only person in the club with a gun that night. Tr. 112. To bolster his defense that more than one shooter was present at the club that night, counsel elicited Detective Romano's testimony that at least three

weapons were responsible for the ballistics evidence recovered on the night of the murder and Detective Albanese's testimony that at least six weapons were fired that night. Tr. 187, 215. On summation, counsel told the jury that they "have to be convinced beyond a reasonable doubt that the bullet that killed that man came from the gun that Mr. Morgan says my client held." Tr. 261. Counsel reminded the jury that two detectives testified that at least three and as many as six guns were likely involved in the shooting that night, and argued that the jury could not find beyond a reasonable doubt that the guns his client allegedly shot were responsible for McCarthy's death. Tr. 274.

Counsel's cross-examination of Morgan emphasized the chaotic atmosphere in the club during the shooting which was crowded with approximately 200 people and was dimly lit. Tr. 137-138. On summation, counsel focused on why Morgan's testimony was unreliable, emphasizing that Morgan did not see guns in petitioner's hands and that the crowded and dimly-lit club made identification of the shooter unreliable. Tr. 263-66. Counsel's summation also highlighted the inconsistencies in Morgan's testimony. Tr. 267-71, 279-81.

Petitioner raises that "[d]uring their two-day deliberations, the jury's questions focussed on the ballistics evidence." Petitioner's Brief at 15 (Document 24). In response, the court read back the entire testimonies of Detectives Romano and Albanese, Tr. 357-358; in fact, the jurors asked for a second read back of Albanese's entire testimony. Petitioner goes on to assert that "Kimmel's gross failures and omissions could have been easily avoided had he done what any effective and competent counsel would have done in similar circumstances: requested appointment of a ballistics expert from the court. Counsel's failure to request a ballistics expert further rendered his performance deficient." Petitioner's Brief at 37.

Applying the presumption of reasonable professional assistance, Strickland 466 U.S. at 684, defense counsel's performance did not fall below an objective standard of reasonableness and petitioner has not met the first prong of the Strickland test. Petitioner has not demonstrated that counsel's failure to request an expert cannot be attributed to strategy. Unfortunately, counsel may have believed that confusion over the ballistics evidence would benefit his client's defense: that the jury could not find guilt beyond a reasonable doubt. The jury's focus on the ballistics evidence during two days of deliberations does not contradict this strategy. As such, petitioner fails to show that he was denied effective assistance of counsel with regard to counsel's strategy to undermine the prosecution's case.

### 3. Failure to Investigate and Consider Possible Alternative Defenses

Petitioner's claim that his trial counsel was ineffective for failing to interview and call exonerating witnesses at trial is clearly petitioner's most compelling claim.[7] Nevertheless, petitioner has failed to overcome the presumption of effective representation, see Darden v. Wainwright, 477 U.S. at 186-87, and his request for habeas relief should be denied.

In Wells v. Greiner, No. 01-CV-4446 (LB) (E.D.N.Y. Apr. 14, 2004), rev'd, 417 F.3d 305 (2d Cir. 2005), this Court granted habeas relief based on the ineffective assistance of trial counsel, citing, inter alia, the trial counsel's failure "to investigate the possibility of an alternate perpetrator," "to interview or call potential exculpatory witnesses," and "to offer any explanation for [his] omissions." Wells, 417 F.3d at 316. The Second Circuit, however, held that defense counsel's conduct "fell 'within the wide range of reasonable professional conduct.'" Id. at 317

---

[7] Petitioner's counsel thoroughly presented this issue and vigorously argued that petitioner is entitled to habeas corpus relief on this ground.

(quoting Strickland, 466 U.S. at 689). The Second Circuit held that "as a general matter, when there is 'reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.'" Id. at 321 (quoting Strickland, 466 U.S. at 691) (citation omitted). The Second Circuit's hesitancy to question defense counsel's decision not to call certain witnesses is clearly important in the instant case, because as the Court stated, the decision to call a particular witness is "typically a question of trial strategy." Id. at 323 (citing United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam)). Moreover, in Wells, the Second Circuit found that "[n]one of the evidence introduced at the evidentiary hearing relating to [counsel's] rationales for pursuing his trial strategy—which consisted, mainly, of testimony that he could not recall his decision-making processes—can overcome the presumption that [counsel] rendered effective assistance." Id. at 325 (emphasis in original).

Here, the record supports the conclusion that petitioner's trial counsel made a decision not to call the witnesses who testified at petitioner's Section 440.10 motion hearing, despite his inability at the hearing to recall the circumstances of petitioner's case. Justice Tomei's decision rhetorically responds to petitioner's "conclusory assertion that no investigation must have taken place, because if it had, ipso facto, all of the potential witnesses would have been called to testify at trial," 440 Decision at 15, by stating that "[e]ven a cursory review of the witnesses who testified at the post conviction hearing reveals numerous reasons why a defense attorney would choose not to call them in this case." Id. at 18. After viewing the witnesses at trial and the witnesses at the hearing, the trial court was unmoved by petitioner's ineffective assistance claim.

Much is made of the fact that "the witnesses at the §440 hearing who identified another

25

shooter all testified that Kimmel never contacted them." Petitioner's Supplemental Memo of Law (Document 31) at 2. As Justice Tomei found, "a number of defendant's friends who allegedly witnessed the shooting met with Mr. Payne [counsel first assigned to represent petitioner] at defendant's mother's home within weeks after the shooting to inform him of their knowledge of the incident." 440 Decision at 2. Although petitioner now argues that "[a]ny competent attorney would have interviewed the individuals who identified another shooter," Petitioner's Supplemental Memo at 3, this assumes that Mr. Kimmel did not have the benefit of Mr. Payne's investigation.[8] Moreover, although the witnesses who testified at the §440 hearing stated that counsel had never contacted them, it cannot be said that counsel's decision not to call these witnesses resulted from "an entirely absent investigation." Wells, 417 F.3d at 325 (citing Kimmelman v. Morrison, 477 U.S. 365, 386, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)). Nor does petitioner present evidence to establish that counsel's decision not to call these witnesses was the product of "incompetence, negligence, or pure serendipity." Id. at 320.

Counsel's inability to recall the rationale for his decision-making at the Section 440 motion hearing almost 11 years after petitioner's trial, see H. 408-09, 415-32, does not establish that he failed to investigate an alternative shooter strategy or that his decision-making was incompetent. As the Second Circuit held:

> Time inevitably fogs the memory of busy attorneys. That inevitability does not reverse the Strickland presumption of effective performance. Without evidence establishing that counsel's strategy arose from the vagaries of ignorance, inattention or ineptitude ... Strickland's strong presumption must stand.

---

[8] Hulen Ginn was interviewed by Payne, H. 45 and said that he was willing to testify at trial, but after speaking with Payne two more times by phone, Payne never contacted him again. H. 47. Defense counsel could have determined that Mr. Ginn's testimony would not be helpful.

Id. at 326 (internal citation omitted).  Similar to the Wells case, the trial record herein makes clear that counsel decided to pursue a strategy attacking the one-witness identification.  Counsel attempted to cast doubt on Morgan's testimony and to elicit testimony that more than two guns were fired in the club on the night in question.  See, e.g., Tr. 263 ("All you have over here is ballistics evidence ... but there's nothing in this entire case that says, besides Mr. Merrick Morgan, that my client was there.").  There is nothing in the record to suggest that counsel's decision to pursue this strategy was the result of "ignorance, inattention or ineptitude."  Wells, 417 F.3d at 326.  Accordingly, the Court should afford petitioner's trial counsel the deference due under Strickland, as petitioner has failed to overcome the presumption of effectiveness.

As detailed above, petitioner pursued his ineffective assistance of counsel claim in his Section 440.10 motion before the Supreme Court, Kings County.  The Supreme Court appointed counsel to petitioner and conducted a four day hearing.  The trial court denied petitioner's ineffective assistance of counsel claim in a thorough and thoughtful twenty page decision, a decision upheld by the Appellate Division.  Contrary to petitioner's urging, this Court does not find that the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Petitioner's Memo of Law at 42 (citing to 28 U.S.C. § 2254(d)(2) (2005)).  Moreover, the Appellate Division's decision to reject petitioner's ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, clearly established Federal law.  It is therefore recommended that petitioner's ineffective assistance of counsel claim should be denied.  See, e.g., Strickland, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one.").

## CONCLUSION

It is recommended that the instant petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 should be denied. Because petitioner has not made a substantial showing of the denial of any constitutional right, it is recommended that no certificate of appealability should be issued. 28 U.S.C. § 2253; see Lozada v. United States, 107 F.3d 1011, 1017 (2d Cir. 1997), abrogated on other grounds, United States v. Perez, 129 F.3d 255, 259-60 (2d Cir. 1997) (discussing the standard for issuing a certificate of appealability); see also Lucidore v. New York State Div. of Parole, 209 F.3d 107, 112-13 (2d Cir. 2000), cert. denied, 531 U.S. 873, 121 S. Ct. 175 (Mem), 148 L. Ed. 2d 120 (2000). (1962).

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. See 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72. Any request for an extension of time to file objections must be made within the ten day period. Failure to file a timely objection to this Report generally waives any further judicial review. DeLeon v. Strack, 234 F.3d 83, 86 (2d Cir. 2000); Spence v. Superintendent, Great Meadow Corr. Facility, 219 F.3d 162, 174 (2d Cir. 2000); see Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

SO ORDERED.

LOIS BLOOM
United States Magistrate Judge

Dated: March 8, 2007
       Brooklyn, New York

Copies to:

THE HONORABLE NINA GERSHON

MARCO LAVAYEN
Petitioner
90-T-4867
Great Meadow Correctional Facility
P.O. Box 51
Comstock, NY 12821-0051

PROFESSOR URSULA BENTELE
Brooklyn Law School
250 Joralemon Street
Brooklyn, NY 11201

CHARLES J. HYNES
District Attorney
ESTHER NOE
Assistant District Attorney of Counsel
Office of the District Attorney, Kings County
350 Jay Street
Brooklyn, NY 11201-2908